Carolyn WHITING and Leonard
Whiting, Appellants–
Respondents,

v.

Burl GENTRY, Guardian/Conservator
of the Estate of Jacquelyn Sylvester
(now Miller) d/b/a Christmas Tree
Lane, Respondent–Appellant.

Burl Gentry, Guardian/Conservator of
the Estate of Jacquelyn Sylvester
(now Miller) d/b/a Christmas Tree
Lane, Respondent–Appellant,

v.

Bonnie J. Wesemann and BCC
Corporation, Appellants–
Respondents.

Nos. WD 58506, WD 58540.

Missouri Court of Appeals,
Western District.

Sept. 11, 2001.

Elvin S. Douglas, Jr., Harrisonville, for
Appellants–Respondents.

Kevin K. Anderson, Harrisonville, for
Respondent–Appellant.

Before SMART, P.J., HOWARD, J., and
HANNA, Sr.J.

HOWARD, Judge.

This case involves several parties in-
volved in several different lawsuits, all
stemming from disputes concerning a
Christmas tree farm. The cases were con-
solidated for trial and have been consoli-
dated for purposes of appeal. Appellants

bring six points on appeal concerning alleged trial error. Respondent brings two additional points in her cross-appeal.

Because we conclude that discussion of Appellants' Points I, II, III, IV and VI and Respondent's Points on cross-appeal would have no precedential value, we will affirm those points by summary order pursuant to Rule 84.16(b), and are furnishing to the parties a memorandum of the reasons for our decision as to those issues. In this opinion we will address only Appellants' Point V regarding the allegation that the court allowed a double recovery of damages to Respondent. That point is reversed and remanded with directions.

## Background

The background of the litigation now on appeal is complex. It involves a dispute over a Christmas tree farm, which began between family members and eventually involved unrelated neighbors. The three consolidated cases stemming from the dispute were tried on June 10 and 11, 1998, in the Circuit Court of Cass County, Missouri. The parties now appeal from an amended judgment entered on April 13, 2000.

We have set forth below the parties' disputes according to the years of the litigation that resulted therefrom. The facts are set forth in a light most favorable to the trial court's judgment. Where necessary, facts not developed in this section will be set forth in our discussion of the points on appeal. Only the 1990, 1991 and 1995 lawsuits are the subjects of this appeal, but each essentially stemmed from the 1981 litigation.

**1981 Litigation:** In the middle to late 1950's, Oscar and Genevieve Urquhart ("the Urquharts") developed land they owned in Cass County, Missouri, by growing Christmas trees to be sold at their "choose-and-cut" Christmas tree farm they called "Christmas Tree Lane." They first sold trees in 1963, and their farm eventually developed into the largest of its type in Missouri.

In 1971, as the Urquharts grew older, Mrs. Urquhart invited her daughter Jacquelyn (Sylvester) Miller (hereinafter "Jackie") to help tend to the family business. By 1974, Jackie and her husband[1] moved to Cass County. In 1977, Jackie purchased the 120-acre family farm from the Urquharts.[2] In 1978, Jackie borrowed $85,200 from the Federal Land Bank (FLB)[3] to assist the Urquharts in building a large A–frame house on the north sixty acres (where the Christmas trees were) for the Urquharts to live in. The FLB note was secured by a deed of trust on forty of the north sixty acres (hereinafter the "North 60"). Jackie and her husband lived on the south sixty acres (hereinafter the "South 60").

Jackie's purchase of the farm eventually resulted in an ongoing family dispute. In short, Jackie claimed to own the land outright, while her mother, Mrs. Urquhart, claimed that Jackie violated their sale agreement. Mrs. Urquhart asserted that Jackie was supposed to purchase the farm on behalf of the family and title the land in both her name and the Urquharts' names.

1. Jackie's husband at the time, James Sylvester, has since passed away. Her current married name is Miller.

2. The 120 acres was divided into two sixty-acre plots by a road dividing the property. The road came to be known as "Christmas Tree Lane."

3. Federal Land Bank, for reasons unrelated to this matter, later became known as "Agribank." For simplicity reasons, we will refer to FLB, because most of the evidence in the record uses that name.

Thus, Mrs. Urquhart sued Jackie in 1981, seeking the imposition of a constructive trust.

On October 12, 1982, the Urquharts and Jackie arrived at a settlement agreement, but apparently did not reduce it to writing. A dispute then arose concerning both the validity and the terms of that agreement, and more litigation ensued. On December 1, 1983, the trial court found that the parties had established without a doubt that an agreement was entered into but never prepared in final form. The court's judgment enforcing the settlement agreement detailed the terms of the agreement as follows:

1. [Mrs. Urquhart] was to receive the North 60 acres in fee simple absolute subject to [Jackie's] right to harvest the standing Christmas trees on said acreage, and in addition thereto, [Jackie] was to have the right to farm and plant additional Christmas trees on said 60 acres for eight (8) years from the date of said agreement. In addition, [Jackie] was to have the right of access to the sales area which existed on the said 60 acres when appropriate for use in selling Christmas trees to the public.

2. [The tools, machinery and other Christmas tree farming implements would become Jackie's property, and she would remove it from the North 60 acres at the end of the eight-year period that she had the right to use the land.]

3. [Mrs. Urquhart] agreed not to plant any Christmas trees on the North 60 acres during the eight (8) year period of time that [Jackie] had the right to utilize said acreage. In addition thereto, [Mrs. Urquhart] agreed not to plant Christmas trees on the North 60 acres at anytime in the future and to prepare a covenant running with the land to place in any deed conveying the North 60 acres to any subsequent purchaser restricting the use of said land so that Christmas trees may never be grown on the North 60 acres after the expiration of the eight (8) year period of time.

4. The agreement further provided that [Jackie] was to receive the South 60 acres in fee simple absolute. . . .

5. The agreement further provided that [Jackie] was to receive all right, title and interest in and to the business known as Christmas Tree Lane and that by implication [Mrs. Urquhart] would relinquish any claims against said business and any interest in and to said business known as Christmas Tree Lane.

6. The agreement further provided that [Mr. and Mrs. Urquhart] would forgive all the present indebtedness owed to [Mr. or Mrs. Urquhart] from [Jackie] or her husband James Richard Sylvester, or both of them, in the approximate sum of Sixty Thousand Dollars ($60,-000.00).

7. The agreement further provided that [Jackie] agreed to assume and pay the entire amount of the outstanding [FLB] loan secured by Deed of Trust on the North 60 acres in the approximate amount of Eighty-two Thousand Dollars ($82,000.00), and further, that said debt would be paid within ten (10) years from the date of this agreement on October 12, 1982.

On July 23, 1984, the parties finally signed a written settlement agreement, with the stated purpose being, "to effectuate and finalize the agreement as found by the Court to exist by its December 1, 1983 Order." Accordingly, Jackie conveyed the North 60 to the Urquharts by a warranty deed executed on July 2, 1984. The deed recited that while the Urquharts would have title to the North 60, Jackie would "have the right to farm, plant, harvest and sell additional Christmas trees on and

from said sixty acres for a period of eight years from *the effective date [t]hereof.*" (Emphasis added.) Jackie received title to the South 60 in fee simple absolute.

The parties abided by the written agreement, but, as the familial discord continued, additional problems soon arose concerning the terms of the agreement and deed to the North 60.

**1990 Litigation:** On August 10, 1990, the Urquharts filed suit against Jackie. The dispute involved the inconsistent language and construction of the settlement agreement and the July 2, 1984, warranty deed on the North 60. In essence, the parties disputed when Jackie's eight-year exclusive-use period began and therefore ended.

Jackie filed her answer, counterclaim and third party petition. In her answer, she alleged that the entire 120 acres remained vested in fee simple absolute in Jackie. She also alleged that the Cass County Circuit Court acted in excess of its jurisdiction and without subject matter jurisdiction when it entered its December 1, 1983, judgment set forth above. She further maintained that she could not be enjoined from entering the North 60 because she owned the land, and she pleaded that the Statute of Frauds barred reformation of the deed as the Urquharts requested.

In her "Counterclaim for Specific Performance," Jackie sought a court order compelling the Urquharts to perform their covenant to defend her title to the full 120 acres that they transferred to her by warranty deed in 1977. Jackie also added FLB and Mr. Plefka (the bank trustee) as third party defendants. She alleged that FLB's claim of title, which stemmed from their interest in forty acres of the North 60 as security for its loan to Jackie, conflicted with the Urquharts' claim of title "emanating from" the December 1, 1983, court order.

Jackie alleged for various reasons that the settlement agreement and the warranty deeds executed as a result of the 1981 litigation were null and void.[4] She asked the court to deny the Urquharts the constructive trust they sought to establish. She then prayed that the court instead declare, as a result of the 1977 sale, Jackie to be the sole, fee simple absolute owner of the full 120 acres, subject to FLB's mortgage lien on the forty acres. She sought damages from the Urquharts (1) for their "willful and intentional breach" of their warranty of good title in the 1977 transfer of the full 120 acres to Jackie, (2) for allegedly destroying "impenetrable thorny hedge" that Jackie had planted to prevent trespassing in her trees on the North 60, (3) for violating § 442.420 RSMo by "failing to give assurances of good fee simple absolute title to the full 120 acres in the 1977 transfer," and (4) for breaching their "warranty of title in fee simple absolute in [Jackie] ... [and their] covenant to defend [Jackie's title] against all attacks from whomsoever."

In November of 1990, as this litigation remained pending, the Urquharts sold their interest in the North 60 and assigned their rights to the 1983 judgment to BCC Corporation, a corporation formed by the Urquharts' neighbor Carolyn Whiting and her sister Bonnie Wesemann. Carolyn, who had grown close to the Urquharts, acknowledged that she was "buying a lawsuit," and she vowed to continue the fight against Jackie on behalf of the Urquharts.

---

4. At some point in this litigation Jackie moved to vacate the 1983 judgment on the grounds of fraud. The trial court dismissed her motion and she appealed to this court. This court affirmed. *Urquhart v. Sylvester,* 848 S.W.2d 13, 14 (Mo.App. W.D.1992) (affirming under Rule 84.16(b)).

Contrary to the requirements of the settlement agreement set forth in our discussion of the 1981 litigation, the warranty deed by which the Urquharts transferred their interest in the North 60 to BCC did not include the restrictive covenant barring the growing of Christmas trees. Nonetheless, it does not appear to have been disputed that BCC had full knowledge of the settlement agreement and the restrictive covenant, but there was an issue concerning the interpretation of the covenant. In addition, the Urquharts agreed to grant BCC a credit for any payments it might be required to make to FLB to protect their interest in the North 60 in the event that Jackie defaulted on her note with FLB that was secured by forty acres of the North 60. The Urquharts also executed a purported assignment to BCC of "all right, title and interest in and to the use of and benefits pertaining to the name 'Christmas Tree Lane.'"

In December of 1990, after the sale, BCC moved to intervene in the 1990 litigation. The trial court granted the motion, and BCC became a party on January 18, 1991. The Urquharts and BCC then filed their First Amended Petition against Jackie. Count I sought a declaratory judgment construing the language of the 1983 judgment and 1984 warranty deed to determine the rights of the parties; Count II sought to enjoin Jackie from entering the North 60 after October 12, 1990; Count III sought reformation of the warranty deed to reflect a date of October 12, 1982, for the beginning date of Jackie's eight-year use of the land; Count IV charged Jackie with trespass for entering the North 60 after October 12, 1990; Count V charged Jackie with conversion for cutting and selling Christmas trees from the North 60 after October 12, 1990; and Count VI sought the court's appointment of a receiver "to keep, preserve and protect the real property and Christmas trees thereon of Intervenor Plaintiff from being further subjected to conversion or other tortious conduct by [Jackie.]"

**1991 Litigation**: As the 1990 litigation remained pending, the 1991 Christmas tree season approached. Jackie sold Christmas trees from her tree farm on the South 60. In direct competition with Jackie, BCC also began to sell trees from the North 60. BCC referred to its farm as "The Hobbit on Christmas Tree Lane" and "The A-Frame on Christmas Tree Lane." Relying on the "Assignment" from the Urquharts, Bonnie, as president of BCC, sent Jackie a letter threatening legal action if she continued to use the "Christmas Tree Lane" name for her tree farm.

On November 13, 1991, in response to BCC's letter, Jackie filed a separate suit against Bonnie Wesemann and BCC. Jackie claimed that pursuant to the settlement agreement with the Urquharts, she had an exclusive right to the use of the trade name "Christmas Tree Lane." She sought to enjoin BCC from unfairly competing with her Christmas tree operation of that name. She also sought to enjoin BCC from "undertaking to use the trade name 'Christmas Tree Lane' in their directly competing Christmas tree farm business." Jackie claimed she had been damaged by BCC's intentional unfair trade practice.

**1995 Litigation**: Eventually, Jackie defaulted on the note with FLB, which according to its terms was to be paid in full by September 12, 1992. FLB threatened to foreclose. The forty acres on the North 60 that were security for the note included the A–frame home where the Urquharts had lived and which BCC was using in its sale of the Christmas trees. Therefore, in June of 1992, to avoid foreclosure, Carolyn Whiting and Bonnie Wesemann, as individuals, purchased the note from FLB for $67,507.36. They borrowed the money for

the purchase from James Bradley, an individual apparently not related to the dispute. Although they purported to purchase Jackie's note as individuals, the loan from Mr. Bradley was guaranteed by Bonnie as president of BCC, and the loan was secured by the deed of trust on the North 60, which was owned by BCC. On May 5, 1994, Carolyn's husband, Leonard, acquired Bonnie's stock in BCC.[5]

In February of 1995, Carolyn and Leonard Whiting (the Whitings) filed a "Petition on Note" against Jackie. In their petition, they alleged that Jackie defaulted in the payment of the January 1, 1995, installment on the note. They also alleged that Jackie failed to pay FLB's attorney's fees it had incurred in the defense of the deed of trust on the North 60 when Jackie brought them into the 1990 litigation. The petition's prayer for relief sought a judgment against Jackie in the amount of $68,417.04 plus interest of 10.75% per annum that was to begin accruing after February 1, 1995. They also sought recovery of their attorney's fees and costs.

Jackie filed her answer and a counterclaim against the Whitings. In her answer, Jackie alleged a failure of consideration, referencing the December 2, 1983, judgment that resulted in Jackie losing title to the North 60 while she remained liable on the note secured by the North 60. She further alleged that the Whitings were estopped from further collecting on the note and that through their own actions the Whitings were not entitled to receive any further installments from her on the note. Specifically, Jackie alleged in her answer that:

> "As a part of said consideration for the continued liability and loss of the real estate, [the Whitings], their alter ego

BCC Corporation and their predecessors in title were not supposed to grow Christmas trees after the expiration of eight (8) years from the date of the [1983] judgment. [The Whitings] ignored said provision and actively entered into competition with [Jackie] ... by doing so they have made it impossible for [Jackie] to pay the note ..."

In her counterclaim, Jackie sought a judgment against the Whitings and "their alter ego corporations and businesses" in the sum of $400,000 for their intentional conduct in breaching the settlement agreement, for their intentional interference with her business, and for violating the restrictive covenant. She maintained that although the Urquharts violated the settlement agreement when they conveyed their interest in the North 60 free of any restrictions to BCC, the Whitings had actual notice of the deed restrictions, but they intentionally disregarded them.

### The Trial Court's Judgment on All Three Cases:

The trial of the three consolidated cases (1990, 1991, and 1995) was held on June 10 and 11, 1998. The court entered its judgment on December 22, 1999. The Whitings and BCC thereafter filed a motion for new trial and suggestions in support of the motion. The trial court then entered its amended judgment on April 13, 2000. Quoting from the trial court's amended judgment, we summarize the findings in each of the three cases below.

**1990 Litigation Results:** On Counts I and III, which concerned Jackie's eight-year exclusive-use period, the trial court found:

> The Warranty Deed of July 2, 1984 should be reformed to show the true

---

**5.** Bonnie sold to Leonard all of her rights to BCC, apparently including her individual

rights to collect from Jackie on the note.

intent of [Jackie and the Urquharts] that [Jackie's] right to farm, plant, harvest and sell additional Christmas trees ran from October 12, 1982, not the date of the deed. There [was] just no other evidence in the case that anyone thought the time period ran from 1984.

On Counts II, IV and V, which concerned Jackie's use of the North 60 after October 12, 1989, the trial court found that under the settlement agreement, Jackie had until Christmas Day of 1989 to grow, harvest and sell Christmas trees from the North 60. It held that "Jackie did not have the right to cut or sell Christmas trees from the North 60 in 1990, and BCC could not have sold them either under the 1982 settlement, 1983 judgment, and the 1984 deed." After discussing the measure of damages and lack of proof of those damages, the trial court ultimately held that "[BCC was] not damaged by the removal of the trees by Jackie" in 1990.

**1991 Litigation Results:** The trial court found that "[f]rom and since April 1, 1977, [Jackie] has owned the tradename 'Christmas Tree Lane.'" Even so, it held that "Bonnie Wesemann and BCC Corporation [had] not unfairly competed with [Jackie.] Also, since both businesses [had] ceased to exist[,] the injunction issue in the case about the use of the name 'Christmas Tree Lane' [had become] moot." The trial court further held there had been no infringement on the name or trademark "Christmas Tree Lane."

**1995 Litigation Results:** The trial court found Jackie in default on the promissory note and awarded the Whitings a judgment against Jackie in the amount of $103,184.82. With regard to Jackie's counterclaim, while the court found that "BCC did not destroy Jackie's business," it held that BCC did "breach [ ] the condition to not grow Christmas trees on the North 60 acres." The trial court pierced the corporate veil of BCC and awarded Jackie judgment against BCC and Carolyn Whiting jointly and severally in the sum of $89,479.07 and against Leonard Whiting in the sum of $18,172.87. The trial court also ordered reformation of the warranty deed on the North 60 to read that Jackie's eight-year exclusive-use period ran from October 12, 1982, the date of the settlement agreement.

As for any remaining claims, the trial court stated in its judgment that "[a]ll other claims for relief or judgments by any party against another [were] denied."

### Point V—Reversal to Amend Damages Award

In Appellants' fifth point on appeal, they allege that the trial court erroneously awarded damages to Respondent. Specifically, they contend that the trial court's judgment for damages against the BCC Corporation and Carolyn Whiting jointly and severally in the sum of $89,479.07 and against Leonard Whiting in the sum of $18,172.87 resulted in a double recovery for Jackie in the amount of $18,172.87.

The portion of the amended judgment about which Appellants now complain reads:

Jacqueline Sylvester Miller is awarded a judgment against BCC Corporation, and Carolyn Whiting jointly and severally, in the sum of Eighty-nine Thousand Four Hundred Seventy-nine and 07/100 Dollars ($89,479.07); and, against Leonard Whiting in the sum of Eighteen Thousand One Hundred Seventy-two and 87/100 Dollars ($18,172.87).

The $89,479.07 figure represents BCC's total sales for the years 1991 through 1994 during which it violated the restrictive covenant by selling Christmas trees. The $18,172.87 figure represents BCC's total sales for 1994—the year Leonard pur-

chased Bonnie's interest in BCC. Although we do not agree that the trial court awarded a double recovery to Jackie, we agree with Appellants that the wording of the judgment is somewhat misleading.

The trial court did not err in piercing the corporate veil of BCC and holding the Whitings individually liable. Upon review of the trial court's amended judgment, it is clear from its "Findings and Conclusions" [6] that BCC and Carolyn were liable to Jackie for damages for all four years that they sold Christmas trees in violation of the restrictive covenant. It is also clear that the trial court intended for Leonard to be jointly and severally liable with Carolyn and BCC for the violation of the restrictive covenant only in 1994—the year he purchased Bonnie's stock in BCC. As the trial court states in its judgment, "it wasn't [Leonard's] business or doings until [1994]." In other words, BCC, Carolyn and Leonard are *all* jointly and severally liable for the $18,172.87 received for the sale of Christmas trees from the North 60 in 1994. BCC and Carolyn are jointly and severally liable for the revenue received from sales for the other three years—1991, 1992, and 1993—in the amount of $71,306.20. This was clearly the intent of the trial court. However, in its judgment, the trial court's separation of the $18,172.87 figure representing Leonard's *portion* of the liability from the *total* damages of $89,479.07 may cause the reader to believe that the $18,172.87 is *in addition to* rather than just a portion of the total $89,479.07 in damages awarded to Jackie.

In order to avoid such misinterpretations, we reverse this portion of the trial court's amended judgment (paragraph B under the "Judgments" section) and remand to the trial court with directions to re-word that portion in accordance with this opinion.

## Conclusion

Appellants' Points I, II, III, IV and VI are denied, as are both of Respondent's points on cross-appeal and the court's judgment is affirmed as to those points. However, Appellants' Point V is granted. Thus, the judgment is reversed as it relates to Point V, and the case is remanded to the trial court to consider its damage award as explained above in our discussion of the point. A memorandum discussing the points not covered in this opinion has been furnished to the parties pursuant to Rule 84.16(b).

SMART, P.J., and HANNA, Sr.J., concur.

6. Specifically, we refer to Paragraph thirty (30) of the trial court's "Findings and Conclu-sions."